United States District Court
Eastern District of New York

----------------------------------X

Gerald C. Prophete,

                Plaintiff,                **Memorandum and Order**

   - against -                No. 19-cv-3466 (KAM) (LB)

Haydee Acevedo-Smith, *et al.*,

                Defendants.

----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

    Gerald Prophete brought this federal civil rights action against Haydee Acevedo-Smith, Abraham Watkins, and Alex Andujar, all officers of the New York City Department of Homeless Services, after an incident at the shelter where he lived. Officer Andujar now moves under Federal Rule of Civil Procedure 56(a) for partial summary judgment as to Prophete's unreasonable search claim against him. The defendants do not seek summary judgment on any other remaining claim. For the reasons below, the Court grants Officer Andujar's motion.

**Background**

    Except where otherwise indicated, the following facts are taken from the parties' statements submitted in accordance with Local Civil Rule 56.1 and are not in dispute.

    Gerald Prophete lived in a communal dorm room at Samaritan

Village, a shelter in Brooklyn run by the New York City Department of Homeless Services ("DHS").  (ECF No. 80-4, Pl.'s Resp. Def.'s R. 56.1 Statement & Pl.'s Counterstatement Facts ("Pl.'s 56.1"), ¶ 1.)  As a resident, Prophete was automatically assigned a bed and a locker next to it.  (*Id.* ¶ 2.)  He signed paperwork regarding Samaritan Village's rules, his bed, and his locker.  (*Id.* ¶ 3.)  He also was given a padlock for the locker, though he used his own instead.  (*Id.*; ECF No. 83-3, Def.'s Resp. Pl.'s Opp'n Def.'s R. 56.1 Counter Statement ("Def.'s 56.1"), ¶ 26.)

DHS Procedure 16-404, which governs locker assignments and client belongings at DHS shelters, requires each shelter's director to complete a "Form 412A."  (Pl.'s 56.1 ¶¶ 4-5.)  That form advises DHS clients that "[a]n agency lock will be provided," that this lock is the only lock that the client may use, and that "[u]nauthorized locks will be removed."  (*Id.* ¶ 6.)  It also explains that DHS will retain either a master key or the combination to the lock.  (*Id.*)  Finally, the form states that the "locker and its contents are subject to inspection, at any time, by authorized personnel" and that "[b]anned articles and substances will be confiscated."  (*Id.* ¶ 7.)

Form 412A has a signature line where the resident may indicate, "I understand my rights and responsibilities regarding my locker and belongings."  (ECF No. 89-3, Zilinski Decl.

2

Ex. B.)  There is no evidence in the record that Prophete ever
signed a Form 412A, however.  (Def.'s 56.1 ¶ 23.)  Prophete
observed the arrests of several residents while he stayed at
Samaritan Village, and he observed each arrested resident's
locker get searched.  (Pl.'s 56.1 ¶ 8.)

On the morning of October 2, 2018, after having lived at
Samaritan Village for five years, Prophete was involved in an
altercation that ended in him being pepper sprayed by Sergeant
Acevedo-Smith and arrested.  (*Id.* ¶¶ 9–11; Def.'s 56.1 ¶ 21.)
After the incident, Officer Andujar told Prophete to give him
the keys to his locker or else he would cut off the lock.  (*Id.*
¶ 27.)  Understanding he had no other choice, Prophete gave
Officer Andujar the keys, and Officer Andujar searched his
locker.  (*Id.* ¶ 30; Pl.'s 56.1 ¶ 12.)

Prophete then brought this action *pro se* against the three
officers involved in the incident, alleging various
constitutional violations.  (*See* ECF No. 1, Compl.)  Since then,
Prophete retained counsel, completed discovery, and voluntarily
dismissed his claims for wrongful denial of medical care.  (*See*
ECF Nos. 71, 75–76, 82, 85.)  Officer Andujar now moves for
partial summary judgment as to Prophete's claim that Officer
Andujar conducted an unreasonable search.  (ECF No. 89, Notice
Mot.)

**Legal Standard**

Summary judgment is proper when there are no genuine disputes of material fact and the undisputed facts entitle the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it might affect the outcome of the case under the governing law.  *Id.*  In resolving a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024).

The party moving for summary judgment has the initial burden to show that there are no genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party would have the burden of proof at trial, the moving party's burden at the summary judgment stage is only to "point out" that there is insufficient evidence to create a genuine dispute of material fact.  *Id.* at 325.  The burden then shifts to the non-moving party to submit its own evidence sufficient to create a genuine dispute of material fact in order to avoid summary judgment and proceed to trial.  *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023).

4

**Discussion**

Prophete brings his unreasonable search claim against Officer Andujar under a provision of the Civil Rights Act of 1871 now codified at Section 1983 of Title 42 of the United States Code (frequently referred to just as "Section 1983"), which allows a private right of action against a state official who deprives another person of a federal constitutional right. (ECF No. 7, Am. Compl., p. 7); *see* 42 U.S.C. § 1983. In response, Officer Andujar invokes qualified immunity, which shields an official from liability in a Section 1983 action unless the asserted right was "clearly established" at the time of the alleged violation. (ECF No. 89-7, Def.'s Mem. Law Supp. Mot. Summ. J. ("Mem."), 7–9); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (stating the current formulation of the qualified immunity doctrine).

A court assesses a qualified immunity claim in two stages. First, it determines whether the official violated a constitutional right. *Washington v. Napolitano*, 29 F.4th 93, 105 (2d Cir. 2022). Second, it determines whether the right was clearly established at the time of the challenged conduct. *Id.* As explained below, the Court finds genuine disputes of material fact as to whether Officer Andujar conducted an unreasonable search; however, the Court concludes that qualified immunity shields Officer Andujar from liability regardless of whether he

5

conducted an unreasonable search.

## I.    Whether Officer Andujar Violated a Constitutional Right

The constitutional basis for Prophete's claim is the Fourth Amendment, which forbids "unreasonable searches." *See* U.S. Const. amend. IV.  "Search" is a term of art meaning an invasion of a place where a person has "exhibited an actual (subjective) expectation of privacy" that "society is prepared to recognize as 'reasonable.'"  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring);  *United States v. Lewis*, 62 F.4th 733, 741 (2d Cir. 2023).

### A.    Whether Officer Andujar Conducted a Search

Officer Andujar first argues that Prophete had no subjective expectation of privacy in his locker regardless of whether such an expectation would have been objectively reasonable.  (Mem. 6.)  In support, Officer Andujar cites Prophete's deposition testimony that Prophete "ha[d] an understanding of why they needed to search [his] locker in [his] room."  (*Id.*; *see* ECF No. 89-6 pp. 4–26 ("Prophete Dep."), 103:11–13.)  Prophete had continued, however, that he "didn't feel the search was needed" and that a search occurred "[e]very time a client [was] arrested but [there was] no probable cause." (Prophete Dep. 103:13–16.)  In context, this exchange reveals little about Prophete's subjective privacy expectations.

More relevant is Prophete's very act of using the locker,

6

through which he manifested an expectation of privacy by "keeping his belongings from plain view." *See MacWade v. Kelly*, 460 F.3d 260, 272 (2d Cir. 2006); *see also United States v. Ross*, 456 U.S. 798, 822–23 (1982) (stating that "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view"). Further, Prophete used his own lock rather than the one DHS provided him, thus manifesting an even greater intent to prevent others from accessing his items. (Def.'s 56.1 ¶ 26.) The record thus leaves genuine disputes as to whether Prophete had a subjective expectation of privacy in his locker.

The Court thus considers whether such an expectation would have been objectively reasonable. A person "has a paramount interest in freedom from government intrusion in his [or her] home." *Jones v. Cty. of Suffolk*, 936 F.3d 108, 119 (2d Cir. 2019). Nonetheless, "the Fourth Amendment protects people, not places," *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (quoting *Katz*, 389 U.S. at 351)), so an "official intrusion" into any similarly "private sphere generally qualifies as a search," *id.* It is not dispositive that Prophete lacked an ownership or possessory interest in his locker at Samaritan Village. For example, "an overnight guest has a legitimate expectation of privacy in his [or her] host's home." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990).

7

Here, the parties offer starkly different characterizations of Prophete's living quarters.  Prophete argues that "the communal dorm room that he lived in . . . for five years" was effectively his "home."  (ECF No. 91, Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. ("Opp'n"), Opp'n 5.)  Officer Andujar, on the other hand, argues that Prophete, as DHS's "client," was not residing in a "home" at all, much less his own.  (Mem. 5.)

The Second Circuit addressed the parameters of what constitutes a "home" for Fourth Amendment purposes in *Anobile v. Pelligrino*, 303 F.3d 107 (2d Cir. 2001), which concerned dorms at a horse racetrack used as residences by the racetrack's employees.  The court concluded the dorms were the employees' "residences entitled to the protection of homes," noting that one plaintiff paid a deposit on the room, had a key he shared with his roommate, and used the room for storing equipment, changing clothes, and "do[ing] anything you do in your own bedroom."  *Id.* at 120.  The other plaintiff had his own room, which he used to store clothes and where he slept most nights.  *Id.*  The plaintiffs signed waivers of their "rights to object to any search" of any premises they had a "right to occupy or control and of [their] personal property," which the Second Circuit found "somewhat reduced" their expectations of privacy but did not totally negate them.  *Id.* at 112, 120.

Drawing all reasonable inferences in Prophete's favor, as

8

the Court must at this stage, the Court finds that the current record could reasonably support a finding that Prophete's shared dorm room qualified as a "residence entitled to the protection of a home" under *Anobile*'s rubric.  Like in *Anobile*, Prophete lived in a dorm-style room.  (Pl.'s 56.1 ¶ 1.)  On the day of the incident, he had lived there for five years, (*see* Def.'s 56.1 ¶ 21), enhancing his expectations of privacy there, *see Sheppard v. Leuze*, No. 21-cv-2075 (KAM), 2022 WL 2315981, at *4 (E.D.N.Y. June 27, 2022) (noting that the "substantial time" the plaintiff "spent on the premises" favored finding plaintiff alleged facts supporting reasonable expectation of privacy).  Though Prophete shared his room, (*see* Pl.'s 56.1 ¶ 1), the fact that one of the plaintiffs in *Anobile* had a roommate did not negate his expectation of privacy in the room, *see* 303 F.3d at 120; *see also United States v. Haqq*, 213 F. Supp. 2d 383, 387 (S.D.N.Y. 2002)(explaining that an "exclusive possessory interest" is unnecessary to establish a reasonable expectation of privacy in an area).

Further, even if the Court were to consider Prophete an "overnight guest" at Samaritan Village rather than a resident entitled to the protection of a home, genuine issues of material fact would remain.  In determining whether an overnight guest reasonably expects privacy, the Second Circuit considers (1) the nature of the guest's visit, (2) the length of time spent on the

property, (3) the connection between the guest and host,
(4) whether the guest has a key, (5) whether the guest can use
the property in the host's absence, and (6) whether the guest
keeps belongings in the host's home. *Figueroa v. Mazza*,
825 F.3d 89, 109 (2d Cir. 2016).  Here, Prophete lived at the
property for five years and used his locker to store his
belongings.  (*See* Pl.'s 56.1 ¶¶ 1–2, 21.)  He presumably lived
there with Samaritan Village's permission, as the shelter
existed to serve the unhoused.  It is unclear whether Prophete
had a key to his room, but he at least used his own key – though
not the one Samaritan Village provided him – to secure his
locker.  (*See id.* ¶ 27.)  The current record is ambiguous as to
the remaining factors, though the balance of the factors does
not so clearly weigh against Prophete that no reasonable juror
could find that he had a reasonable expectation of privacy in
his locker.

Officer Andujar responds that the ultimate question the
*Figueroa* factors implicate is whether the host "so liberally
shared [its] own privacy interest with [its] guest that it
shelter[ed] the guest against unreasonable government
intrusion," and that DHS's own policies establish that it did
not intend to "share" any privacy interest with Prophete.  (Mem.
5 (quoting *Figueroa*, 825 F.3d at 109).)  But the record leaves
substantial ambiguity regarding precisely what DHS's policies

were.  The parties agree Prophete signed "paperwork related to
Samaritan Village rules, his bed[,] and [his] locker
assignment," (*see* Pl.'s 56.1 ¶ 3), but Officer Andujar does not
specify what this "paperwork" said.  Officer Andujar has
produced a form residents could sign, which contemplates that
the resident's "locker and its contents" would be "subject to
inspection, at any time, by authorized personnel," but there is
no evidence Prophete ever signed the form or even was aware of
it.  (*See* Pl.'s 56.1 ¶¶ 6-7.)

Even if Prophete had signed that form, it is not certain
that doing so would have eliminated his privacy expectations in
his room.  Both plaintiffs in *Anobile* signed "blanket waiver[s]
of the right to object to any future searches of [their]
residences," yet the Second Circuit found "the demand embodied
by the waiver provision . . . unreasonable" because there was
"no evidence demonstrating that the plaintiffs were aware of
their right to refuse to give consent" or "whether they could
refuse and still obtain employment."  303 F.3d at 124-25.  The
stakes for Prophete were even higher, as he stood to lose not
merely a job but a place to live.  *See Cox v. Dawson*,
No. 18-cv-578 (JBA), 2020 WL 127890, at *8 (D. Conn. Jan. 10,
2020) (declining to read public housing tenant's lease as
"irrevocably waiving her right to refuse entry to her apartment"
because "otherwise, eligible tenants would have to bargain away

11

their Fourth Amendment rights for lengthy and for indeterminate periods to receive public housing benefits"). The existence of the form, which there is no evidence Prophete knew about or signed, does not remove all triable issues of fact regarding his reasonable expectations of privacy.

One factor distinguishing this case from *Anobile* is that Samaritan Village is a state-run facility rather than merely a private facility in an industry closely regulated by the state. (*See* Pl.'s 56.1 ¶ 4); 303 F.3d at 111. Still, Prophete did not lose all reasonable expectations of privacy simply because he resided at a shelter. His choice was between the "shelter and the streets," so Samaritan Village was "the most private place [he] could possibly have gone." *See Cmty. For Creative Non-Violence v. Unknown Agents of the U.S. Marshals Serv.*, 791 F. Supp. 1, 6 (D.D.C. 1992); *see United State v. Voice*, 622 F.3d 870, 877–78 (8th Cir. 2010) (finding "troubling" government's implication that "a person has no Fourth Amendment" rights in "a closed container left unattended near a bunk in a homeless shelter, college dormitory, or military barracks"). The fact that a facility is state-run may bear on a resident's privacy expectations, but it does not eviscerate them.

Officer Andujar's cases regarding workplace searches, (*see* Mem. 6), fully comport with this view. The court in *DeMaine v. Samuels*, No. 99-cv-34 (JBA), 2000 WL 1658586, at *7 (D. Conn.

Sept. 25, 2000), for example, concluded that a police officer lacked a reasonable expectation of privacy in the desk in his office but had a reasonable expectation of privacy in the personal day planner he kept in his office.  The dispositive fact was not that those items were in a state-run workplace but rather whether each item was work-related or personal in nature.  *See id.*  Relatedly, as the Supreme Court has explained, the lower standard for government workplace searches "does not necessarily apply to a piece of closed personal luggage, a handbag[,] or a briefcase that appears to be within the employer's business address."  *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) (plurality opinion).  That follows from the premise that a person may reasonably expect more privacy in a closed container than in the room where the container is found.  *See, e.g.*, *United States v. Gilmore*, 498 F. Supp. 3d 585, 590 (S.D.N.Y. 2020) (holding roommate's consent to search shared apartment did not extend to "closed containers in the bedroom that obviously belonged to" defendant).

Moreover, the state-run workplace search cases are not analogous in that the plaintiffs in those cases did not regularly sleep in the areas searched.  Whether a guest reasonably expects privacy in a host's home, for example, depends on how the guest uses the home.  *Compare Olson*, 495 U.S. at 98-99 (overnight guest who slept at home with host's

13

permission had reasonable expectation of privacy) *with Minnesota v. Carter*, 525 U.S. 83, 90–91 (1998) (guest with no prior connection to homeowner only present in home during day for commercial transaction had no reasonable expectation of privacy).  One factor that motivated the Second Circuit in *Anobile* to find that the workers enjoyed the same Fourth Amendment protections applicable to homes in their racetrack dorm rooms was that the workers slept there.  *See* 303 F.3d at 120.  Similarly, part of the Supreme Court's rationale for treating government workplaces differently for Fourth Amendment purposes has been that "the privacy interests of government employees in their place of work . . . are far less than those found at home."  *See O'Connor*, 480 U.S. at 725.  Thus, a key reason why government workers might enjoy lower expectations of privacy in their workplaces is that they generally use those areas to work rather than to live, which was not the case here.

Finally, the mere fact that Prophete previously observed searches of other residents' lockers when those residents were arrested, (*see* Pl.'s 56.1 ¶ 8), did not render his privacy expectations unreasonable.  As explained above, the factual record leaves genuine disputes of material fact as to whether the search of Prophete's locker was constitutional.  If the prior searches of other residents were conducted under similar circumstances, that leaves open the possibility that the policy

14

authorizing those searches was unconstitutional.  *See, e.g.,*
*Gem. Fin. Serv., Inc. v. City of N.Y.*, 298 F. Supp. 3d 464, 499
(E.D.N.Y. 2018) (holding facially invalid local law authorizing
warrantless inspections of pawnbrokers).  A person does not lose
an otherwise reasonable expectation of privacy simply by
observing the government unconstitutionally violate the privacy
of others in similar ways.

The degree to which Prophete reasonably expected privacy in
his locker at Samaritan Village would have been affected by a
wide range of circumstances that the relatively thin factual
record before the Court does not establish, including further
detail about the physical layout of Samaritan Village and
Prophete's room, how Prophete used his locker, and Samaritan
Village's policies.  Given that the Court must draw all
reasonable inferences in Prophete's favor in resolving Officer
Andujar's summary judgment motion, the Court cannot conclude
that no reasonable jury could find Prophete had a reasonable
expectation of privacy in his locker and thus that Officer
Andujar's inspection of the locker was a search.

**B.   Whether the Search was Reasonable**

A warrantless search is presumptively unreasonable, *Jackson*
*v. City of N.Y.*, 29 F. Supp. 3d 161, 176 n.20 (E.D.N.Y. 2014),
and Officer Andujar does not argue or provide any evidence that
he or any other officer had a warrant to search Prophete's

15

locker.  Officer Andujar also does not argue that any exception
to the warrant requirement applied.  (*See generally* Mem.)  For
the sake of completeness, however, the Court finds that the
record lacks sufficient evidence of any exception to entitle
Officer Andujar to summary judgment.  Although establishing that
a warrantless search occurred does not shift the burden to the
defendant to establish that an exception to the warrant
requirement applies, *Ruggiero v. Krzeminski*, 928 F.2d 558, 563
(2d Cir. 1991), it may require the defendant to produce at least
some evidence supporting the exception, *Harris v. O'Hare*,
770 F.3d 224, 234 (2d Cir. 2014).

One exception to the warrant requirement applies where the
government has consent to conduct the search.  *United States v.
Lajeunesse*, 85 F.4th 679, 686 (2d Cir. 2023).  Coerced consent,
however, is invalid.  *United States v. O'Brien*, 926 F.3d 57, 76
(2d Cir. 2019); *see Gem Fin. Serv., Inc. v. City of N.Y.*,
298 F. Supp. 3d 464, 488 (E.D.N.Y. 2018) (finding store owner's
consent coerced where officer threatened to disrupt store's
business if owner did not comply with requests to turn over
items).  Here, Prophete surrendered his keys to Officer Andujar,
but only after Officer Andujar threatened to cut his lock if
Prophete failed to comply.  (*See* Def.'s 56.1 ¶¶ 27, 30.)
Prophete's decision to surrender his keys in the face of that
threat was not effective consent, and Officer Andujar properly

16

does not argue that it was.

Another exception to the warrant requirement applies where a search occurs incident to an arrest. *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017). But "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search," the exception "does not apply." *United States v. Bell*, No. 19-cv-717 (LAK), 2020 WL 370342, at *3 (S.D.N.Y. Jan. 22, 2020) (quoting *Arizona v. Gant*, 556 U.S. 332, 339 (2009)) (finding search-incident-to-arrest doctrine inapplicable where officer searched defendant's backpack while defendant was pressed against car and being patted down). Here, though the record indicates Officer Andujar searched Prophete's locker roughly contemporaneously with Prophete's arrest, (*see* Pl.'s 56.1 ¶¶ 11-12), the record lacks any evidence suggesting that Prophete might have had the ability to reach into his locker during or after the arrest. The record also lacks evidence that the search was otherwise "required to ensure officer safety or to protect any evidence." *See Bell*, 2020 WL 370342, at *3. Accordingly, Officer Andujar is not entitled to summary judgment based on the search-incident-to-arrest doctrine.

Finally, yet another exception to the warrant requirement applies where the government conducts a proper "administrative search." The administrative search doctrine applies where the

17

government has "special need" that "make[s] the warrant and probable-cause requirements impracticable" and the "primary purpose" of the search is to advance a governmental interest beyond a "general interest in crime control." *Weisenberg v. Town Bd. of Shelter Island*, 404 F. Supp. 3d 720, 736 (E.D.N.Y. 2019) (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015)).  Determining whether the administrative search doctrine applies involves considering the privacy interest allegedly compromised, the character of the governmental intrusion, the nature and immediacy of the government's concerns, and the efficacy of the governmental conduct in meeting them. *Palmieri v. Lynch*, 392 F.3d 73, 81 (2d Cir. 2004).

It is conceivable that state-run shelters might have special needs beyond general crime control justifying warrantless searches of their residents' lockers.  To make that determination, however, the Court would have to consider evidence of the competing interests, which is lacking in the record currently before the Court.  *See Weisenberg*, 404 F. Supp. 3d at 736 (declining to apply administrative search doctrine to dismiss Fourth Amendment claim where "based on the complaint alone," court could not "make the requisite special-needs or primary-purpose assessments as a matter of law" and defendants did not "raise[] [those] issues"); *MacWade v. Kelly*, No. 05-cv-6921 (RMB), 2005 WL 3338573, at *16 n.28 (S.D.N.Y.

Dec. 7, 2005) (finding defendants had "burden of producing evidence of a 'special need' and supporting the factors which must be balanced under the 'special needs' doctrine" even though plaintiffs "retain[ed] the (ultimate) burden of persuasion"). The Court thus cannot grant Officer Andujar summary judgment based on the administrative search doctrine because he did not argue that a special need justified his search of Prophete's locker or offer any evidence of a special need.

## II. **Whether the Right was Clearly Established**

Prophete's unreasonable search claim ultimately fails because Officer Andujar is immune from liability for searching Prophete's locker regardless of whether the search violated Prophete's rights. As explained above, (*supra* 5), qualified immunity shields an official from liability for violating any constitutional right that was not clearly established at the time of the alleged violation. The right must be defined by reference to the specific facts of the case, not in terms of abstract legal principles. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam).

In deciding whether a right was clearly established, the Court may consider only Supreme Court and Second Circuit precedents that existed at the time of the alleged violation unless a robust consensus of out-of-circuit authorities obviously foreshadows a similar result in this circuit. *Radwan*

19

*v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022).  The relevant authority or authorities must be sufficiently factually analogous to put the constitutional question "beyond debate." *Pauly*, 580 U.S. at 79 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

Prophete frames the constitutional question here as whether "a person enjoy[s] the clearly established protection of the Fourth Amendment in a locked closed container located inside their home."  (Opp'n 12–13.)  Under the governing standards, Prophete's framing defines the asserted right at "too high a level of generality."  *See City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam); *see also City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam) (reversing court of appeals for framing constitutional question as whether a person had the "right to be free of excessive force" where question should have been framed as whether constitution "prohibited the officers from stopping and taking down a man in these circumstances"); *Winfield v. Trottier*, 710 F.3d 49, 57 (2d Cir. 2013) (reversing district court for framing question as whether it violated suspect's rights "for a consensual search to exceed the scope of the consent given" where question should have been framed as whether it violates the constitution "when a police officer reads a suspect's private papers, the text of which is not in plain view, while conducting a search authorized solely by the

20

suspect's generalized consent to search the area in which the papers are found").

Phrased at the appropriate level of specificity, the constitutional question implicated by Officer Andujar's present summary judgment motion is:  Does it violate the Fourth Amendment for an officer to conduct a warrantless, nonconsensual search of a shelter resident's locker inside a communal dorm room during the resident's arrest?

Prophete's cited authorities do not put that precise question "beyond debate."  *See Pauly*, 580 U.S. at 79.  The only Supreme Court or Second Circuit case Prophete cites, *United States v. Karo*, 468 U.S. 705 (1984), did not concern a search of a shelter resident's locker but rather a container of chemicals to which law enforcement officers had affixed a "beeper" that monitored the container's movements inside a home.  Further, the portion of the decision that Prophete cites is a concurring opinion, not the majority opinion.  (*See* Opp'n 13.)  Moreover, the cited portion of the concurring opinion is *dicta*, which is not clearly established law even when it appears in a majority opinion.  *See Napolitano v. Flynn*, 949 F.2d 617, 624 (2d Cir. 1991) (finding that "dictum, standing alone, [was] insufficient to create a 'clearly established' right").  Thus, *Karo* falls far short of the authority necessary to put the constitutional question in the instant case beyond debate.

Prophete's remaining authorities, which comprise district court decisions and out-of-circuit appellate decisions, (*see* Opp'n 13–14), do not reflect a robust consensus of persuasive authorities regarding the scope of Fourth Amendment protections that apply to lockers located in communal dorm rooms inside state-run shelters, *see, e.g.*, *McKinney v. City of Middletown*, 49 F.4th 730, 740 (2d Cir. 2022) (finding out-of-circuit decisions and district court decisions holding that the use of an untrained or poorly trained police dog could amount to unconstitutionally excessive force did not reflect a robust consensus that using a police dog for a purpose outside its training could amount to excessive force).  All of Prophete's authorities concerned searches that occurred inside private residences, not state-run facilities.  *See United States v. Turner*, 23 F. Supp. 3d 290, 310–19 (S.D.N.Y. 2014); *United States v. Chisholm*, No. 07-cr-795 (NGG), 2009 WL 29313, at *7–10 (E.D.N.Y. Jan. 5, 2009); *United States v. Peyton*, 745 F.3d 546, 552–56 (D.C. Cir. 2014); *United States v. Waller*, 426 F.3d 838, 845–49 (6th Cir. 2005); *United States v. Fultz*, 146 F.3d 1102, 1105–06 (9th Cir. 1998); *United States v. Block*, 590 F.2d 535, 539–42 (4th Cir. 1978); *United States v. Robinson*, 999 F. Supp. 155, 161–63 (D. Mass. 1998).  Though *Fultz* involved a search of an unhoused person's private container, the container was located in a residential garage; it was not a state-owned

22

container located inside a state-owned facility.  *See* 146 F.3d at 1105–06.

That factual distinction is sufficiently material to prevent Prophete from overcoming qualified immunity.  *See, e.g.*, *McKinney*, 49 F.4th at 741–43 (finding no clearly established law prohibiting officers from striking, tasing, and allowing dog to continue biting arrestee lying on ground who previously resisted arrest but was not presently resisting despite circuit law holding that tasing an arrestee who previously resisted arrest but was not presently resisting amounted to unconstitutionally excessive force); *Cugini v. City of N.Y.*, 941 F.3d 604, 616 (2d Cir. 2019) (finding "right to be free from excessive force during handcuffing" clearly established but also finding it not clearly established where person handcuffed "exhibited only non-verbal aural and physical manifestations of her discomfort" and did not make "an explicit verbal complaint"); *Berg v. Kelly*, 897 F.3d 99, 112 (2d Cir. 2018) (finding it clearly established that nonconsensual confinement violated the Fourth Amendment but not clearly established where confinement was for purpose of protecting the President).

Accordingly, because Prophete's asserted constitutional right defined at the appropriate level of factual specificity was not clearly established by Supreme Court or Second Circuit precedent or by a robust consensus of persuasive authorities at

the time of the alleged violation, qualified immunity shields Officer Andujar from liability with respect to Prophete's unreasonable search claim.

### Conclusion

For the reasons stated above, the Court grants Officer Andujar's motion for partial summary judgment and dismisses Prophete's unreasonable search claim against Officer Andujar with prejudice.  The Court will set Prophete's remaining claims for trial.  The parties shall jointly file a proposed pre-trial order in accordance with Section IV(A) of the undersigned judge's Chambers Practices by August 19, 2024.


**So ordered.**

Dated:    August 5, 2024
          Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York